[Civ. No. 19836. Second Dist., Div. Three. May 13, 1954.]

ANITA C. SMITH, Respondent, v. GEORGE HOMER SMITH, Appellant.

Weyl & Weyl, Bertin A. Weyl and John A. Weyl for Appellant.

Savenick & Shapiro, Jerome D. Savenick, Chester B. Shapiro and Martin S. Stolzoff for Respondent.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, S. Ernest Roll, District Attorney (Los Angeles) and Harold O. Pressman, Deputy District Attorney, as Amici Curiae on behalf of Respondent.

VALLÉE, J.—Appeal by defendant from an order in a proceeding brought under the "Reciprocal Enforcement of Support Law." (Code Civ. Proc., §§ 1650-1681.) Defendant also appeals from an order denying his motion for a new trial. Since the latter order is nonappealable the appeal therefrom will be dismissed.

The "Reciprocal Enforcement of Support Law" was enacted in 1951. (Stats. 1951, ch. 694.) It was amended in 1953. (Stats. 1953, ch. 1290.) This proceeding is governed by the law as originally enacted. The support law is designed to enable a dependent in one state to secure money for support from a person residing in another state who is legally liable for the support of the dependent. Its purposes are to improve and extend by reciprocal legislation the enforcement of duties of support. The dependent—or in case of a minor, its guardian—may commence proceedings in a court of the state in which she or he resides, called the initiating state, by filing a complaint and causing a summons to be

issued. If the summons is returned "not found," the court determines whether the defendant owes a duty of support and whether a court of the state in which the defendant resides, called the responding state, may obtain jurisdiction of the defendant or his property. If it so determines, it certifies accordingly and causes certified copies of the complaint, the certificate, and an authenticated copy of the support law of the state to be transmitted to the court of the responding state. When this state is the responding state, upon receipt of the copies from the court of the initiating state the court dockets the cause, notifies the county counsel or district attorney of the county, sets a time and place for hearing, and takes such action as is necessary in accordance with the laws of this state to obtain jurisdiction. If on the hearing the court finds a duty of support, it may order the defendant to furnish support or reimbursement therefor and subject his property to such order. The court then transmits to the court of the initiating state a copy of all orders of support or reimbursement. Security may be required; payments may be ordered to be made to the probation officer of the county; and violation of any order is punishable by contempt.

On November 20, 1945, plaintiff, Anita C. Smith, filed a complaint for divorce from defendant in the Court of Common Pleas, Litchfield County, Connecticut, in which she alleged jurisdictional facts, that she married defendant on August 19, 1944, grounds for divorce, and that there was one child, Carol, the issue of her marriage with defendant, born April 10, 1945. She prayed for a divorce, for custody of the child, and for support for herself and the child. Defendant was served with the complaint and on December 5, 1945, appeared in the action. On February 27, 1946, plaintiff moved the court to place the action on the uncontested list. The motion was granted on March 8, 1946. On March 15, 1946, judgment was rendered granting plaintiff a divorce, decreeing that the parties had one minor child the issue of the marriage, Carol, granting plaintiff custody of the child, and ordering defendant to pay plaintiff $15 a week for the support of Carol.

On April 7, 1952, plaintiff filed a petition for support of Carol in the Connecticut court in which she alleged that the child is in need of and entitled to support from defendant under Connecticut law; about December 1, 1946, and subsequent thereto, defendant refused and neglected to provide fair

and reasonable support for Carol according to his means and earning capacity; on information and belief, that defendant was residing or domiciled in Burbank, California; and that California has enacted a law similar to Connecticut's reciprocal support law.[1] The prayer was for an order of support directed to defendant. At the same time plaintiff filed with the Connecticut court an "Election to Proceed" which stated in effect that she understood that the filing of the petition of April 7, 1952, "might be interpreted by a Court of competent jurisdiction as an election by her to submit to the jurisdiction of the Court of the responding State where her" former husband resides. A summons issued ordering defendant to show cause why the order for support should not be made. The sheriff made a return that he could not with due diligence locate or serve defendant with the summons in Connecticut. A judge of the court then made a certificate which recited the above facts; stated he had examined plaintiff under oath and she had reaffirmed the allegations of the petition; stated that according to her testimony the needs of Carol for support from defendant are $15 a week; that defendant should be compelled to answer the petition; and ordered that the certificate together with exemplified copies of the petition and summons be transmitted to the superior court of Los Angeles County, California.

The documents were filed with the clerk of the superior court of Los Angeles County on May 6, 1952. Thereafter an order to show cause issued out of the superior court commanding defendant to show cause why an order should not be made on the basis of the petition, directing him to pay to plaintiff such sum as the court might determine for the support of Carol.

Defendant appeared in response to the order to show cause and a trial was had. The court found: the facts alleged in the petition are true; Carol is the minor child of plaintiff and defendant; Carol is living with plaintiff in Connecticut and is partially dependent on defendant for support; defendant owes a duty of support of Carol; $10 a week is a reasonable sum to be contributed to her support; defendant has the present ability to pay said amount. An order followed commanding defendant to pay $10 a week to the probation officer of Los Angeles County for the support of Carol and ordering the probation officer to send all monies received to the clerk of the Connecticut court. Defendant appeals.

---

[1]1951 Cum. Supp. to Conn. Gen. Stats., ch. 415a.

The assignments of error are: 1. The initiating papers filed by plaintiff do not contain sufficient facts to constitute a claim or cause of action against defendant and do not comply with the statutory requirements. 2. The court erred in denying defendant the right to prove that the original Connecticut decree ordering him to support Carol was obtained by extrinsic fraud, and in refusing to permit him to prove that he is not the father of Carol and therefore he owed no duty of support. 3. The "Reciprocal Enforcement of Support Law" is unconstitutional.

At the time in question section 1674 of the Code of Civil Procedure provided: "If the court of this State acting as an initiating state finds that the complaint sets forth facts from which it may be determined that the defendant owes a duty of support and that a court of the responding state may obtain jurisdiction of the defendant or his property, he shall so certify and shall cause certified copies of the complaint, the certificate and an authenticated copy of this law to be transmitted to the court of the responding state." Section 1675 provided that when the court of this state, acting as the responding state, receives from the court of an initiating state the aforesaid copies, it shall docket the cause and proceed. Section 1670 provided: "Duties of support enforceable under this law are those imposed or imposable under the laws of any state where the alleged obligor was present during the period for which support is sought or where the obligee was present when the failure to support commenced, at the election of the obligee."

The first assignment of error is predicated on the claim that the petition filed April 7, 1952, states that a copy of the Connecticut law is attached thereto but that in fact such was not the case, and that the initiating papers do not show that defendant, the obligor, was present in Connecticut during the period for which support is sought or that plaintiff, the obligee, was present in Connecticut when the failure to support commenced. The point has no merit. A copy of the Connecticut law was transmitted to the superior court.[2] That is all the law requires.

[2]This court, on its own motion, ordered that the record on appeal be augmented by including therein the superior court file in this proceeding. It appears therefrom that an authenticated copy of the Connecticut law was transmitted to the superior court as provided in section 1675. It also appears therefrom that an exemplified copy of the testimony of plaintiff given in Connecticut was transmitted to the superior court.

■ Under section 1670 it is only when there is a difference in the duty of support provided by the respective states that the initiating papers should show one or the other of the facts claimed by defendant, and in such case the obligee has an election as to the law of the state under which she shall proceed. There is no difference in the duty of support for a child under the age of 17 years provided by Connecticut law and that provided by California law. (Civ. Code, § 196; 1951 Cum. Supp. to Conn. Gen Stats., ch. 415a, § 1396b.) The purpose of the section is to give the dependent an election in the event of conflicting laws. In any event, defendant cannot raise this question, since the choice is that of the obligee-plaintiff.

■ At the trial defendant offered to prove that: at the time the parties were married plaintiff was pregnant "by another man"; on the evening they were married plaintiff told defendant she had made a mistake, she never should have married him, and she was not going to live with him; they stayed in a hotel room that night; the next morning she went back to her home; they did not live together thereafter; a week later she told him she was pregnant; he told her he was going to get an annulment; she said, "No, you are not"; she told him his job wouldn't be worth a nickel, "she was going to plaster all over town the fact that he assaulted and raped her sister," he was queer, and unless he let her get a divorce "she would do this"; she demanded $1,000; he told her, "I don't have that kind of money"; she said, "Well, give me $15 a week, and that's all I will ever ask of you"; they had an oral agreement that if he would not defend the divorce action and would let her get a quiet divorce and pay for the hospitalization of the child, she would accept $15 a week through the year 1946 and there would be no further obligation on his part to pay her any money whatsoever; he paid her $15 a week, "not as support for any child, not in recognition that he was the father of the child, but because she made that demand on him, and because he was in a small town and didn't want his name plastered all over this small town in Connecticut"; on this understanding "he did not go in and defend the Connecticut action"; Carol was born 228 or 231 days after the marriage; he did not have intercourse with plaintiff prior to the marriage; he "was prevented from going in and defending the action on the grounds that she informed him that they had an understanding, and that she would never make any de-

mand on him for any money other than the payments for 1945 and 1946''; he was induced not to defend the divorce action by her representation that she would make no further demand on him for the support of Carol; he paid her $15 a week through 1946, and paid the hospital bills at the birth of Carol; if he had known she was going to secure a decree for the support of the child, ''which he claims and at all times has insisted was not his,'' he would have defended the action on the merits; he did not receive a copy of the divorce decree or any order of the Connecticut court; he had no knowledge that the Connecticut decree contained a finding that he was Carol's father; no demand was made on him at any time for the support of Carol until the present proceedings were instituted. Plaintiff's objection to the offer of proof was sustained. Defendant asserts that the facts stated in the offer constitute extrinsic fraud; that he was entitled to establish as a defense in this proceeding that the Connecticut decree which adjudged that he is Carol's father was obtained by extrinsic fraud; and that it was error to sustain the objection.

Section 1916 of the Code of Civil Procedure provides: ''Any judicial record may be impeached by evidence . . . of fraud in the party offering the record, in respect to the proceedings.''

A court of equity under proper circumstances will set aside a judgment obtained by fraud. (15 Cal.Jur. 8, § 120.) The fraud must be extrinsic and collateral. (*Huron College* v. *Yetter,* 78 Cal.App.2d 145, 149 [177 P.2d 367].) Extrinsic or collateral fraud is defined in *Gale* v. *Witt,* 31 Cal.2d 362, thus (p. 365 [188 P.2d 755]) : ''The fraud which will justify the setting aside of a final judgment by a court of equity must be of such character as prevents a trial of the issues presented to the court for determination. [Citations.] Where the fraud practiced is collateral to and outside of court so that a party is, because of such fraud or concealment, effectively deprived of presenting his case or all of his defense, it is extrinsic and equity will give relief. . . . [T]o constitute extrinsic fraud, there must have been some representation or concealment by the defendant which prevented the plaintiff from having his day in court.''

We are of the opinion that the facts stated in the offer of proof do not constitute extrinsic fraud. *Hendricks* v. *Hendricks,* 216 Cal. 321 [14 P.2d 83], is decisive. The

facts are concisely stated in the opinion (p. 322): ''The action is one to annul and set aside an interlocutory decree of divorce alleged to have been obtained by reason of the threats, coercion and duress of the defendant. It appears from the complaint herein that in March, 1925, the defendant brought suit for divorce in the state of New York charging plaintiff with having committed adultery. In July of the same year the plaintiff instituted an action in California for maintenance. The defendant visited the plaintiff in California the following October and offered to dismiss the New York action if plaintiff would abandon her maintenance suit and, instead, bring an action for divorce charging the defendant with desertion. Upon this occasion and at divers other times during the ensuing years, the defendant is alleged to have stated that he had sworn confessions of certain named persons that each of them had committed adultery with plaintiff; that he would disgrace and degrade plaintiff; that her child would be taken from her by the court and that she would never be allowed to see the child again; and that he would secretly take the child from her unless she agreed to his demands. In 1925 the plaintiff apparently 'partially consented,' but nevertheless neglected to commence the divorce action until 1927. The matter then remained dormant until November, 1928, at which time an answer was filed and a stipulation signed by the respective attorneys that the divorce action should be tried as a default. Thereafter the interlocutory decree which it is here sought to have set aside was entered. The complaint in the present action then alleges that subsequent to the entry of said decree and between December, 1928, and April, 1929, the plaintiff for the first time ascertained that the statements and threats of the defendant were false and untrue and made solely for the purpose of intimidating and compelling plaintiff to bring the suit in divorce against her will and for the purpose of freeing the defendant from his marital obligations to plaintiff and their child.'' The court stated the familiar rule that equity will not vacate a judgment obtained through the collusive connivance of the parties to the action, that to warrant such relief there must be extrinsic fraud, and continued (p. 323): ''Where, however, evidence of the coercion or duress or the fraud could have been presented to the court or to an attorney of the complainant's own choosing during the pendency of the action so that full examination of the facts could be made and full protection given to the rights

of the parties, equity will not interfere but will leave the parties to the fraudulent transactions where they have placed themselves. (*Mitchell* v. *Cline,* 84 Cal. 409, 416 [24 P. 164].)

"The alleged threats to blacken the plaintiff's reputation, the charges of adultery, and the threats to deprive plaintiff of the custody of her child by court order or other means, were matters over which the plaintiff herein could have had a thorough hearing during the pendency of the divorce action. The court before whom that action was pending was in a position to determine all issues pertinent thereto, including any question as to the custody of the minor child of the parties. It also possessed the necessary vitality to compel obedience to its decrees. Plaintiff should have informed her attorney in the divorce action of all the facts here alleged and she would have received the protection of the court in all of her marital rights. Failing to seasonably do this, it is now too late to seek relief on the grounds here urged. There is nothing in the record to indicate that the attorney representing plaintiff in the divorce action was in fact the attorney for the defendant or that he was inimical in any respect to the best interests of the plaintiff. (*Pico* v. *Cohn,* 91 Cal. 129, 133 [25 Am.St.Rep. 159, 3 L.R.A. 336, 25 P. 970, 27 P. 537].) The allegations of the complaint disclose, at best, intrinsic fraud and coercion and plaintiff is therefore concluded by the interlocutory decree of divorce procured through the collusion of the parties litigant, which decree has long since become final. It is our conclusion, therefore, that the complaint fails to present a case of equitable cognizance." Similar representations and threats made under like circumstances were held not to constitute extrinsic fraud in *Thompson* v. *Thompson,* 38 Cal.App.2d 377 [101 P.2d 160].

"A party who has been given proper notice of an action, however, and who has not been prevented from full participation therein, has had an opportunity to present his case to the court and to protect himself from any fraud attempted by his adversary. [Citations.] Fraud perpetrated under such circumstances is intrinsic, even though the unsuccessful party does not avail himself of his opportunity to appear before the court. Having had an opportunity to protect his interest, he cannot attack the judgment once the time has elapsed for appeal or other direct attack." (*Howard* v. *Howard,* 27 Cal.2d 319, 321 [163 P.2d 439].)

Defendant made a personal appearance in the Connecticut action. He was represented by an attorney in the action. After making an appearance, he permitted judgment by default to be taken against him. Three months elapsed between the time he appeared in the action and the time the cause was placed on the uncontested list. The action was regularly tried and determined. It was decreed that defendant is Carol's father. Defendant was fully informed of all proceedings in the divorce action. He knew the complaint alleged that Carol was the issue of his marriage with plaintiff and that plaintiff prayed for support for Carol from him. He made no objection to the allegations of the complaint. No appeal was taken from the decree. The decree became final and conclusive against him with respect to all issues therein determined. Defendant was not prevented from having his day in court in the divorce action. As in *Hendricks* v. *Hendricks, supra,* 216 Cal. 321, all of the alleged facts stated in the offer of proof were matters over which defendant "could have had a thorough hearing during the pendency of the divorce action." Having failed to assert his defenses in that action, it is now too late to seek relief on the grounds urged in the offer of proof.

The offer of proof says that plaintiff agreed to withdraw the allegation of the complaint for divorce that he was Carol's father and the prayer for support of Carol. If such an agreement was made, it was of no force or effect. A father, a resident of this state, is under a legal obligation to support his minor child residing in another state and in the legal custody of its mother by virtue of a decree of divorce given to the mother by the courts of the state in which she and the child reside. A parent may not by any act, conduct, or arrangement of whatever sort shift from his shoulders the legal responsibility and moral duty to support his minor child. It is an absolute, inalienable right enjoyed by the child which no form of contract between the parents, nor change of the domestic status of either of them, may affect. (*Southern Calif. Edison Co.* v. *Industrial Acc. Com.*, 92 Cal. App. 355, 358 [268 P. 415]; *Nicholas* v. *Nicholas,* 110 Cal.App. 2d 349, 353 [242 P.2d 679].)

We conclude that the court did not err in sustaining the objection to the offer of proof.

The court did not err in refusing to permit defendant to prove that he is not the father of Carol. That issue was determined against him by the decree in the Connecticut

action. ■ The Connecticut decree is res judicata and must be given full faith and credit in this state. (Code Civ. Proc., § 1913; *Biewend* v. *Biewend,* 17 Cal.2d 108, 111-112 [109 P.2d 701, 132 A.L.R. 1264]; 15 Cal.Jur. 240, § 246.)

Defendant contends that he has been denied due process of law in contravention of the Fifth and Fourteenth Amendments of the Constitution of the United States and article I, section 13 of the Constitution of California, and that the provisions of the "Reciprocal Enforcement of Support Law" are in contravention of the equal protection clause of the Fourteenth Amendment and article IV, section 31 of the Constitution of California.

■ The Fifth Amendment to the Constitution of the United States applies to the federal government and not to the several states and does not constitute a limitation on the power of the states. It has no application here. (*Corrigan* v. *Buckley,* 271 U.S. 323 [46 S.Ct. 521, 70 L.Ed. 969]; *People* v. *Raffington,* 98 Cal.App.2d 455, 456 [220 P.2d 967], cert. den. 340 U.S. 912 [71 S.Ct. 292, 95 L.Ed. 659].)

The purposes of the support law are to improve and extend by reciprocal legislation the enforcement of the duties of support and to make uniform the law with respect thereto. (Code Civ. Proc., § 1651.)[3] Great difficulties have been met in compelling husbands and fathers who have left a state to support their dependents.[4] The National Desertion Bureau in New York estimates that close to 100,000 persons annually attempt to escape their duties of support by desertion, and that nearly 1,000,000 women and children in America are the victims.[5] The increasing number of runaway husbands and fathers has created a social problem which has compelled interstate cooperation, an attempt to reduce state welfare expenditures, and led to the enactment of reciprocal enforcement laws.[6]

---

[3]Forty-six states and the territories of Hawaii, Puerto Rico, Alaska, and the Virgin Islands have similar laws.

[4]25 Temple L. Quar. 336.

[5]Zukerman, The Problem of Family Desertion, a report to the Legal Aid Association in Boston, October 1949.

[6]In June 1948 approximately 223,000 families were receiving some $178,000,000 a year in public assistance throughout the United States as a result of family desertion. See Aid to Dependent Children in a Post War Year, Public Assistance Report No. 17, Federal Security Agency (Published June 1950).

"The need for some type of legislation enforcing the duty of support on deserting husbands was pointed up by testimony at the committee hearings, indicating that the 1949 estimated total bill for aid to de-

■ It is argued that because there is no provision in the support law giving defendant the right to cross-examine plaintiff with reference to the need of support, the ability of plaintiff to furnish support, and the resources of plaintiff and Carol—he is being deprived of his property without due process of law. ■ Denial of the right of cross-examination may constitute a denial of due process. (*Massachusetts etc. Ins. Co.,* v. *Industrial Acc. Com.,* 74 Cal.App.2d 911, 916 [170 P.2d 36].)

The judicial function in these proceedings is divided. In one state court the complaint is filed and the evidence in support of its allegations is heard. If that court determines the defendant owes a duty of support and that the court of this state may obtain jurisdiction of the defendant or his property, it so certifies; and the complaint, the certificate, and a copy of the law of that state are transmitted to the court of this state. (Code Civ. Proc., §§ 1674, 1675.) The matter is then heard by the court of this state, and if it finds a duty of support it may order the defendant to furnish support. (Code Civ. Proc., § 1676.) In other words, the final decision and order is made by the court of this state. If any deprivation of due process is caused by the participation of two courts in disposing of a single action, it would have to be in the taking of ex parte evidence in one court for use in the deciding court.

■ A defendant in a proceeding under the support law has a right to cross-examine the plaintiff. While the support law does not specify the details of the procedure to be followed in this state on receipt of the papers from the initiating state, it is not to be treated as an isolated fragment of our judicial system. ■ In the absence of prohibitive legislation, the courts have inherent power to provide themselves with appropriate procedures for the performance of their tasks. (*Ex parte United States,* 7 Cir., 101 F.2d 870, 878.) Section 187 of the Code of Civil Procedure provides: ''When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means

---

pendents where the father was absent and not supporting was approximately $205,000,000 a year for the Nation and the several states.'' (Progress Report of Senate Interim Judiciary Committee, pp. 11-13, Vol. I, Appendix to Journal of the Senate, 1951.)

The Attorney General says that ''From July 1, 1952 to March 31, 1954 the aggregate sum of $93,070.20 was ordered paid to dependents residing in Los Angeles by courts of other states.''

See Brockelbank, ''The Problem of Family Support: A New Uniform Act offers a Solution.'' 37 Am.Bar Assn.Jour. 93.

necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.''

In this state testimony may be taken in three ways: by affidavit, by deposition, or by oral examination. (Code Civ. Proc., § 2002.) A defendant in a civil action or special proceeding is not guaranteed a right of confrontation at the trial of the action or proceeding. (26 C.J.S. 808, § 2. See *In re Bagwell,* 26 Cal.App.2d 418 [79 P.2d 395].) The testimony of a witness out of this state may be taken by deposition in an action at any time after the service of summons or the appearance of the defendant, and in a special proceeding at any time after a question of fact has arisen. (Code Civ. Proc., § 2020.)

 The due process clause does not guarantee to the citizen of a state any particular form or method of state procedure. (*Dohany* v. *Rogers,* 281 U.S. 362 [50 S.Ct. 299, 74 L.Ed. 904, 912]; *City of Los Angeles* v. *Oliver,* 102 Cal. App. 299, 315 [283 P. 298].) There is nothing new in using a foreign court to take testimony (9 A.L.R. 966; 108 A.L.R. 384; 96 Univ.Pa.L.Rev. 241), and there is nothing inherently wrong in allowing the courts of two sovereigns to participate in the taking of evidence in a single case with the court of one sovereign acting in an ancillary capacity to the deciding court in another forum. The courts of this state in acting under the support law do not abdicate any of their judicial power in deciding cases before them. If it be said that the defendant is at a disadvantage in having to take the testimony of the plaintiff and other witnesses in the initiating state, the answer is that he may always choose to return to that state to conduct his defense more directly and efficiently.

The Court of Appeals of Kentucky has recently had occasion to consider the constitutionality of the reciprocal support law of that state in *Duncan* v. *Smith,* —— Ky. —— [262 S.W.2d 373]. The court said (262 S.W.2d 377): ''The third objection raised against the Act is that it is extraterritorial in its application, in that it purports to give Kentucky courts jurisdiction outside this state, and to give foreign courts jurisdiction in this state.

''It is true that the Act is so worded as possibly to give

the impression that the Kentucky legislature is attempting to confer powers upon courts of other states to act within this state, and to give our courts powers in other states, but when the Act is examined as a whole it becomes clear that the Act merely provides what our courts may and shall do in this state, and that any powers exercised by foreign courts in their own states are exercised by virtue of a reciprocal law of that state and not by virtue of the Kentucky Act.

"Actually, the Act does not attempt to confer extraterritorial jurisdiction. The court of the initiating state exercises no jurisdiction over the respondent, but merely serves as a local agency of convenience for the court of the responding state. The latter court acquires jurisdiction of the respondent by virtue of personal service upon him, and exercises its jurisdiction over him solely within the confines of its state.

"While perhaps the court of the responding state does not have full technical jurisdiction over the *petitioner*, yet from a practical standpoint it has such jurisdiction over the petitioner as to enable the court to make a binding determination of the petitioner's rights, or to compel the petitioner to meet certain requirements as a condition of being granted the relief sought. The fact that the petitioner is not required to be physically present in the responding state is no obstacle, because in any ordinary action a petition may be filed in a court of this state without the plaintiff being present in the state. As we view it, the question of whether the plaintiff shall be required to be physically present is a question of practice and not of jurisdiction."

That there is no deprivation of due process is clear. When the court of this state receives the papers from the initiating state the defendant is given notice, an opportunity to be heard, by deposition to examine and cross-examine the plaintiff and any witness that may have testified in the initiating state, to examine and cross-examine any witnesses that may testify in this state, to meet opposing evidence, and to oppose with evidence. Thus the requirements of due process are complied with. (*Morgan* v. *United States*, 304 U.S. 1, [58 S.Ct. 773, 82 L.Ed. 1129].)

Furthermore, in this proceeding defendant appeared in the superior court on July 17, 1952, at which time he made various motions. The matter was continued to August 19, 1952, when a partial hearing was had. Various continuances were then had until January 13, 1953, when the matter was heard in its

entirety by another judge. At the first hearing on July 17, 1952, the court suggested to counsel for defendant that the "matter go over for a period of time to permit you to take the plaintiff's deposition." Counsel did not take advantage of the suggestion. Again on November 19, 1952, the court said to counsel for defendant, "[I]f you want to take the depositions of the parties, I will give you time within which to do so." Again counsel ignored the court's offer. Defendant is in no position to say that he was denied the right to cross-examine plaintiff.

The equal protection clause does not preclude the states from resorting to classification, but only requires that the classification be reasonable, not arbitrary, and rest on some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly situated will be treated alike. (*Old Dearborn D. Co.* v. *Seagram-Distillers Corp.*, 299 U.S. 183 [57 S.Ct. 139, 81 L.Ed. 109, 106 A.L.R. 1476].) The guarantee of equal protection is not a guarantee of absolute equality of operation or application of state legislation on all persons in the state. (*Stebbins* v. *Riley*, 268 U.S. 137 [45 S.Ct. 424, 69 L.Ed. 884, 44 A.L.R. 1454].) The support law operates as to persons in this state on the same basis. The classification of certain persons as being entitled to support is no different from support statutes which operate between residents of the same state. The purpose of the classification is a reasonable one and it has a fair and substantial relation to the object of the law. The support law provides a reasonable classification when tested in the light of the traditional judicial application of the equal protection clause.

It is claimed that furnishing legal services to a plaintiff in a proceeding under the support law constitutes a gift of public money or thing of value in violation of article IV, section 31 of the Constitution of this state, and the equal protection clause of the Fourteenth Amendment. The claim is based on the erroneous premise that there is something in the support law which compels the county counsel or district attorney of a county to represent the obligee in this state. There is no such provision in the law. The law merely provides that when the court of this state receives the papers from the initiating state it shall notify the county counsel or district attorney of the county. (Code Civ. Proc., § 1675.) It did not, at the time of these proceedings, impose any duty

on the county counsel or district attorney.[7] It appears that the district attorney of Los Angeles County represented plaintiff in the superior court in this proceeding. If he did so without authority, a fact we do not assume, that question cannot be raised by the defendant in this proceeding.

Appeal from order denying a new trial dismissed. Order commanding defendant to furnish support affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 7, 1954.

---

[7] In 1953 the law was amended to provide that "The prosecuting official [district attorney, city attorney, or city prosecutor] may, upon request of the court, represent the plaintiff in any proceeding under this title." (Stats. 1953, ch. 1290.)

In response to a similar contention, it was said in *Duncan* v. *Smith*, —— Ky. —— [262 S.W.2d 373]: "Sixth, it is claimed that the Act violates Section 3 of the Kentucky Constitution, in that it grants the privilege of free legal representation to a dependent person when the person liable to furnish support is in another state, but denies such privilege when the person liable for support is in the same state. This is a question of reasonable classification. We think that the practical difficulties involved in the securing of support by one person from a person residing in another state constitute a valid basis for granting free legal representation in such cases and denying it in cases where both persons are residents of the same state. Besides, in the final analysis, the free legal representation is for the benefit of the public as a whole, and not of the particular dependent person."